Our next case for argument is 2012-1393 ALMOND BROS. LUMBER v. United States Mrs. Altman, when you're ready. May it please the Court. As this Court has found back in 2011, in 2006 the United States Trade Representative entered into the softwood lumber agreement pursuant to Section 301. Counsel, would you describe the softwood lumber agreement as a reciprocal trade agreement? A reciprocal trade agreement. A reciprocal trade agreement being one where both countries, the United States and Canada, assumed and negotiated trade commitments and trade obligations? I'm not sure I would, Your Honor. Your Honor, it was an agreement that obviously was intended to end an unfair trade practice. Whether or not it falls into a reciprocal trade agreement, I'm going to have to defer an answer to you. I'm not sure I can answer. It was a negotiated agreement. It was negotiated, yes, Your Honor. And under the agreement, both parties agreed to undertake certain obligations and commitments. That is true, Your Honor. Canada was required to reimpose export charges on lumber shipped to the United States. And the United States was required to refund $5 billion in duties. Correct. So would you say that the terms of the agreement were negotiated? Yes, they were, Your Honor. Absolutely. So how can we, as a court of law then, step in and change the negotiated terms? Doesn't that upset the entire balance of the agreement? The question here is whether or not the USTR followed the statute in negotiating that agreement. And she did not, Your Honor. The violation is not between the United States and Canada, of course. It's what the USTR did. We would not be upsetting the agreement because all we're suggesting here, Your Honor, is that the $500 billion was the amount that Canada paid. We're not suggesting that it changed that one item, not one penny. We're not suggesting, obviously, that the $5 billion that was shipped back to Canada changed in any way. What we're saying here is that the USTR, in negotiating and entering into that agreement, simply failed to follow the statute, 19 U.S.C. 2411, and make sure that the compensatory trade benefit that is required by the statute. So your complaint is not the amount or the value that was achieved in the agreement. Not at all, Your Honor. That's exactly correct. And you're also not complaining about whether Canada had to provide any refund of duties to the United States. Not refund of duties, but any type of monetary compensation. Not complaining about that at all, Your Honor. You're complaining that because under the agreement, a certain amount of the compensation went to the coalition and not to the entire industry. That's correct. Now, isn't that a negotiated term? It was negotiated. I agree, Your Honor. So then, let's get back to my question. How are we to change within the structure of an agreement? Call it quid pro quo. I would call it a reciprocal trade agreement. But how are we to, as a court of law, to change one negotiation term? Doesn't that bring down the entire agreement? No, Your Honor, it doesn't. Because Canada said, I will give back $500 million, essentially, to the U.S. industry. The USTR is the one that required to go only to the coalition. Canada didn't care about the identity of who would be the recipients of this. All they cared about is how much will I have to pay back. Show me the record where we find that Canada did not care. The record is devoid of any mention of how this was negotiated, Your Honor. So there is nothing in the record. But the issue that we have before the court is not what Canada did or didn't do. The issue is what the USTR didn't do. The statute says she was supposed to require a compensatory trade benefit, if feasible. We have $500 million of feasibility to go to the economic sector in which the adversely affected industry is located. She didn't do that. We have a statutory violation. Are you saying that the coalition, the members of the coalition, are not members of it? They are, indeed, Your Honor. That says, what part of the statute do you say she violated? She violated 2411C4. Right. But what language in that statute do you contend was violated? It says, and I quote, Your Honor, it says, that the trade agreement shall provide compensatory benefits that benefit the economic sector, which includes the domestic industry that would benefit from the elimination of the act. But that doesn't specify in any particular way who gets what, or pro rata, or anything at all. It doesn't make sense, Your Honor, because it doesn't just say that they shall require trade benefits. It says that they have to be compensatory trade benefits. Does that mean that every member of the economic sector should be required to submit some damages evidence, and that the payout has to match that damages evidence? It would suggest that it has to be compensatory, and that means that it must be consistent with damages suffered by the members of the- Well, you're asking us to read compensatory in a tort sense. I'm asking you not to do what the CID did, which is to read the word compensatory. How about if we don't read just the word compensatory, but we read the entire phrase, compensatory trade benefits? Yes. Now we're outside of the tort area, correct? Yes. So how is it that the USTR did not negotiate compensatory trade benefits for the lumber sector, or the agriculture sector, or the manufacturing sector? Because she didn't. All she did was to say, pay this $500 million to that portion of the economic sector that happens to belong to this particular club. It was a billion dollars, and half of that went to the coalition. That's correct. How is that not compensatory trade benefits that benefit the economic sector that's involved? Well, first of all, they weren't compensatory. Well, they're trade benefits, then. They were trade benefits. Okay. But compensatory is instead- If the word compensatory wasn't here, you'd be okay. If the word- Yes, I would be. Compensatory is very important. What the benefits did, the $500 million went to the coalition with no instruction whatsoever. They were distributed on the basis of how much each member of the coalition had, in fact, contributed to legal things. It was not compensatory in the least. There was no indication that any of the members of the coalition had, in fact, suffered damage. Were any of your clients' parties or petitioners named parties in any of the lumber cases? The only named parties were from the United States, as I recall, was the executive committee of the coalition. Okay. But none of your clients were named parties or petitioners? No, they were not, Your Honor. Okay. Let's say we were to look at the word compensatory in the damage sense. Wouldn't that apply, or isn't it reasonable that the U.S.C.R. would negotiate compensatory trade benefits to the parties that were actually involved in the litigation below? If- But that's not what the statute says. It may be- No, but I'm following your interpretation of the statute. Okay. And you're equating compensatory to damages. I'm saying that they must bear a relationship to the harm suffered. I just pointed a relationship to you, and that is that the coalition were petitioners in all the lumber cases, and your clients were not. But, Your Honor, they couldn't have brought a petition in the first place without 20 percent of the industry having agreed to participate as petitioners. They couldn't have consummated the softwood lumber agreement unless 60 percent of the capacity had agreed on it. I understand how standing is achieved in dumping and countermeasuring duty cases, and I understand the definition of a domestic industry within a trade context. And it seems that your clients don't fit or fall within those strict definitions. They were not petitioners. They were not identified as exporters or producers of the product in the ITC case. It's true, Your Honor. The SLA could not have occurred without our clients, those passive members of the industry, as the CIT referred to them, because they are the ones that actually agreed to the SLA. They are the ones that gave up the rights to file petitions against any other harms that might flow from Canadian exports for seven years. That couldn't have happened without them having agreed to the SLA. They're the ones who gave up some legal benefits, not the coalitions. The agreement, compared to the terms of the CIT... The members of the coalitions had to drop their investigations and administrative reviews, and they had to forego the customs assessing anti-dumping or countermeasuring duty cases in that situation. Your Honor, I think that's not necessarily true. I think what we have here is the agreement as originally negotiated is that the coalition or the executive committee of the coalition was going to give up its litigating position in 20 different agreements, in 20 different cases. What happened, though, that changed on October the 12th, 2006. The agreement that went into force, the coalition did not give up. It did not settle any case. Contrary to what the CIT found, they did not give up anything in exchange for the $500 million. Mr. Solomon, it seems to me you're trying to read the statute, 2411C4, as requiring that the agreement provide compensatory trade benefits that benefit all members of the economic sector, and further, all members equally. Not equally, Your Honor. It has to benefit those members of the economic sector who were harmed, and those members that were harmed in proportion to the harm that they suffered. But where does the statute say all members to start with? First, again, going back to compensatory, it does say that the idea of this is to benefit the economic sector. I agree with you, Your Honor. Well, here the agreement does provide $500 million worth of compensatory trade benefits that certainly benefit the coalition and their members of the sector. It does not say that it shall benefit a sliver of the economic sector, and that's what we have here, Your Honor. But isn't that where the USTR has discretion, and isn't that why this is not really a claim that can be made? Because there's no standard by which a judge can decide whether the USTR complied or didn't comply. I don't believe so, Your Honor. I think that in a case of a remedial statute, and I think we would agree that this is a remedial statute, to read the term economic sector, under your thesis, taken to its logical conclusion, the USTR could have given that $500 million to one company, and one could say the economic sector was benefited. I don't believe that that is consistent with the letter or the spirit of this statute, Your Honor. But that's not what happened here. I mean, you're giving a hypothetical. We're talking about, you know, maybe a hundred. Your Honor, what did happen here is that the ITC identified 240 companies that had been adversely affected by the Canadian Lumber Imports. So let me, let's take those 240 companies that you're talking about. Are they all members of the economic sector involving lumber? Yes. They're all softwood lumber companies. Would you say that some of them include the domestic industry that would have benefited from the elimination of the Act? Well, I mean, as softwood lumber companies, they would be in the economic sector that included domestic lumber companies, yes. Well, the economic sector could be the entire agriculture sector. I think that would be an extremely broad interpretation, and I don't think that would be appropriate here. Well, if you want us to narrow that definition, why not narrow domestic industry to mean the domestic industry that brought and championed and paid for and advanced and prosecuted the countervailing duty cases for all those years against Canada? But that's not why they were paid, Your Honor. They were not paid as compensation. For, if they had said, we are going to provide you back with the legal fees, there wouldn't have been $500 million. It would have been more like $70 million. What they were providing here was some sort of a bonus. At the expense of 140 other companies in the industry, that got little than enough. And I think that that is totally inconsistent with the tenor of this statute, which is remedial. They are to provide compensatory trade benefits. She negotiated $500 million worth of them and then proceeded to give them only to a sliver of the economic sector. Thank you, Mr. Saltzman. We'll restore you three minutes of rebuttal time. You've got a lot of questions from the Court. Mr. Silverbrand? Thank you, Your Honor. May it please the Court. The compensatory trade benefits here are not just $500 million. It was a billion-dollar distribution. Plus, the primary compensatory trade benefits here are the export duties that Canada agreed to place on its software lumber exports. That is the primary benefit of the software lumber agreement. The $500 million was an additional compensatory benefit that was given to members of the Coalition for Fair Lumber Imports because the Executive Committee of the Fair Lumber Coalition was the plaintiff in many of the pending actions of the CIT and was participating not only in the negotiations but in NAFTA panel decisions. They were the petitioners in the countervailing duty cases and before the NAFTA panels. That's correct, Your Honor. And nothing in the statute would require a reading as appellants are asking for. The statute specifically states, shall provide compensatory trade benefits that benefit the economic sector. And that you skip down to subsection A and B unless the provision of such trade benefits is not feasible or trade benefits that benefit any other economic sector would be more satisfactory than such benefits. This is clearly a statute meant to give wide discretion to the USDR. If Congress and the President had wanted to pass a law restricting the USDR's authority, they could have done so. But this statute is clearly designed to grant wide discretion to the USDR because if you read this in conjunction with 19 U.S.C. 2171, the USDR is negotiating on behalf of the President. The USDR is an ambassador of the United States. The USDR negotiated here an executive agreement, which is akin to a treaty. It doesn't have to pass two-thirds of the Senate like a treaty, but courts do treat executive agreements as political questions in most instances. Now, Mr. Shultzman argues that the statute contains this language, compensatory trade benefits, and that puts some limits on the discretion, limits that could be adjudicated because a judge could decide whether the USDR's actions are arbitrary or capricious or something of that sort. What's your reaction to that? Well, I think the limit it puts on is that there must be some trade benefits. Well, he focuses on compensatory. Well, provide compensatory trade benefits, and I had you skip down to a subsection of A and B, unless the provision of such trade benefits is not feasible or trade benefits that benefit any other economic sector would be more satisfactory. So the statute is not requiring the USDR to provide compensatory trade benefits that benefit the economic sector if she determines that other trade benefits will be more satisfactory. So your view of the statute is that it's not nearly as constrained and focused as Mr. Shultzman argues? Certainly not, Your Honor. And even if we did not have subsections A and B, which greatly expand the authority granted here, provide compensatory trade benefits that benefit the economic sector, which includes the domestic industry that would benefit from the elimination of the Act, is talking about a sector of the economy. The sector of the economy could, in this case, include home builders, could include softwood lumber producers, it could include environmental groups that support the growth of renewable forests, it could include many, many aspects of our economy. It is not restricted to the domestic industry. It's providing compensatory benefits to the economic sector. And there's no feasible argument that the economic sector here did not include members of the coalition. And part of the $1 billion that Canada sent back to the United States, half of that, part of that went to educational programs, marketing efforts, joint efforts between Canada and the United States to advertise and promote lumber products. Is that correct? That's correct, Your Honor. I'm not sure of the exact figures, but some of it went to a binational lumber panel. Other amounts went to environmental groups and educational groups. And there was a separate suit in the Ninth Circuit that was a challenge to that, and the Ninth Circuit held that there was no standing to challenge that. But you're correct, it went to various aspects of the economic sector, the second half of the $1 billion that was returned. But again, we have to keep in context that the $1 billion was not the primary trade benefit here. The primary trade benefit was the export restraints that were placed on Canadian softwood lumber exports to the United States. I believe our discussion of the political question factors covers the alternative argument that the appellants failed to say a claim on Count 2 of their amended complaint, because APA review would lead to the same results here. There's no discernible standard of the statute to determine whether the USTR violated this specific subsection. So I'll move on to the trial court holding that the complaint fails to state an equal protection claim. There's no heightened standard of review here, so we're looking at a rational basis standard of review. And the case law is very clear that unless the complainant here, the appellants, could disprove every conceivable rational basis for the agreement, they have not stated a due process claim, and they have not done so here. There's clearly a rational basis in negotiating a $500 million distribution to compensate members of the softwood lumber coalition for their participation in litigation, their loss of their positions as litigants in the Corrigan National Trade and at the D.C. Circuit, and for their quintessence themselves. When the SLA was entered into, what happened to all of the pending CBD cases that were out there? They were all eventually moved and found, because part of the softwood lumber agreement required no injury letter submissions by 15% of the softwood lumber industry to the ITC, which eliminated the interim determination. The ITC had no choice, based upon those submissions, but to find no determination, which eliminates all the anti-dumping and countervailing duty orders. There were a couple of steps involved, but essentially all the cases were moved, Your Honor. So all those claims were lost. For these reasons, and those set forth in our brief, we respectfully request that you affirm the decision of the Shelforce Law. Thank you, Your Honor. Thank you, Mr. Silverbrand. Mr. Saltman, you have three minutes of rebuttal. Thank you, Your Honor. Your Honor, the first thing I'd like to say is that with regard to Section 2411C4, Parts A and B have no application here, because we now have a situation where the trade benefit in question was not feasible. As I said, there's $500 million of feasibility. Likewise, we're not saying that some other sector made more sense to give the trade benefit to, expense to a trade benefit. It was this economic sector in which the softwood lumber industry was located. That makes the sense. That's what the USTR did. The dollars that actually went to the binational commission and the meritorious initiatives were really not compensatory trade benefits. They were, I would agree with you, some sort of trade benefit that flowed from this, but they were not in any way compensatory. They did not deal in any way with any harm that anyone in the economic sector had incurred. The only compensatory benefits here are the $500 million. With regard to the equal protection argument that we had raised and Mr. Silberman raised, the CIT below said that the coalition gave up their legal rights, and that's why they should be singled out and they could get this $500 million. Your Honors, in the SLA, they did not give up a single right. They did not settle a single case. There is no rational reason why they were singled out on that basis. The CIT was dead wrong. What we have here, Your Honor, is if anybody gave up any rights, it was the industry as a whole. Mr. Silberman is right. The 20 cases in which the coalition were involved were all subsequently dismissed, not because it was a settlement, but because the SLA had mooted the entire question. Again, the coalition gave up nothing. They were not even a signatory to the SLA. They were not entitled to be signaled out for $500 million worth of compensation because they were giving up something. The CIT was dead wrong. Have you looked at NX2A? Yes, Your Honor. On the SLA, it's titled Termination of Litigation Agreement. I have, Your Honor. But have you, Your Honor, looked at the fact that that provision was eliminated on October 12, 2006 and never went into effect? All those signatures that you see there were never signed. That was when the new agreement was entered into. And the countervailing duty investigations were mooted. The countervailing duty investigations were mooted on October 12. As a result of the agreement. As a result of the agreement. But the coalition did not give up any rights in any legal case by signing that agreement. But if you're a party to a litigation and you moot your own case. They didn't moot it. The agreement itself had that effect. But they did not give up the right. As a matter of fact, the coalition, after the agreement was signed, did in fact try to continue some of the litigation. And the court said, no, we will not allow you to proceed. It is moot by virtue of the SLA. Okay, thank you, Mr. Salton. I think it was helpful for the argument. Thank you for submitting.